(No. 21147.—

LYMAN B. MANSELL, Appellee, *vs.* THE LORD LUMBER AND FUEL COMPANY *et al.* Appellants.

*Opinion filed April 23, 1932.*

Loucks, Eckert & Peterson, (Chilton P. Wilson, of counsel,) for appellants.

Ossian Cameron, and Edward H. S. Martin, for appellee.

Mr. Justice Duncan delivered the opinion of the court:

Appellee, Lyman B. Mansell, of Chicago, Illinois, filed in the circuit court of Cook county a bill for specific performance of a contract for the sale of real estate in DuPage county against appellants, the Lord Lumber and Fuel Company and W. A. Draper. Separate answers to the bill were filed by appellants, and the Lord Lumber and Fuel Company filed a cross-bill praying for the reformation of the contract, to which appellee filed his answer. After replications had been filed the cause was referred to a master in chancery, who took and reported the evidence with his recommendations. Objections of the Lord Lumber and Fuel Company to the master's report were overruled and were ordered to stand as exceptions. The exceptions were overruled and a decree for specific performance of the contract was entered. This appeal followed.

The allegations of appellee's bill are, that on June 28, 1930, he and the Lord Lumber and Fuel Company entered into a contract in writing the substance of which is the following: The Lord Lumber and Fuel Company of LaGrange, Illinois, hereby agrees to sell, and appellee agrees to purchase, the following described real estate situated in DuPage county, Illinois: Lots 1, 2, 3, 10, 11 and 12 in block 2, and lots 1, 2, 3, 10, 11 and 12 in block 3, all in

Reed's subdivision in section 12, township 38 north, range 11, east of the third principal meridian, subject to (1) existing leases expiring October 1, 1930, appellee to be entitled to the rents, if any, from the time of delivery of the deed; (2) all taxes and assessments levied after the year 1929; (3) any unpaid special taxes or assessments levied for improvements not yet made; and (4) a first mortgage of $5500 due September 15, 1931, which appellee assumes and agrees to pay. Appellee has paid $1000, and agrees to pay a further sum of $1000 on June 30, 1930, as earnest money, to be applied on the purchase when consummated, and agrees to pay, within five days after the title has been examined and found good, the further sum of $10,500 at the office of McClintock & Prouty, Hinsdale, Illinois, provided a good and sufficient general warranty deed, with release of dower and homestead rights, conveying to appellee a good title to the premises, subject as aforesaid, shall then be ready for delivery. A complete abstract of title or merchantable copy was to be furnished within a reasonable time, with a continuation thereof brought down to this date. In case the title, upon examination, is found materially defective within ten days after the abstract is furnished, then, unless the material defects be cured within sixty days after written notice thereof, the earnest money shall be refunded and this contract shall become inoperative. Should appellee fail to perform this contract promptly on his part at the time and in the manner herein specified, the earnest money, at the option of the vendor, shall be forfeited as liquidated damages, including commission payable by vendor, and this contract shall be and become null and void. Time is the essence of this contract and all the conditions thereof. The contract and earnest money shall be held by McClintock & Prouty for the mutual benefit of the parties hereto. It was signed by the Lord Lumber and Fuel Company by W. A. Draper and by appellee. Appellee further alleged that he had paid $2000 under the contract

and was ready and willing to comply with all its terms and to pay the balance of $10,500 due from him and which he had tendered to the vendor, but the vendor refused, and still refuses, to comply with the terms of the written agreement; that the title to the lots was in the name of Draper at the time of the delivery of the written agreement and is still in his name, subject to the mortgage for $5500 and also subject to the liens of other unpaid special assessments set forth in his bill for local improvements that had been completed when the contract of sale was entered into, said unpaid assessments amounting to $7000 or more; that the company has notified appellee that no deed to the lots would be executed unless appellee would take title subject to all unpaid installments of the special assessments. The prayer of the bill is for a decree for specific performance of the written agreement, a copy of which is attached to the bill as an exhibit, and that appellee may be authorized and directed to pay the liens, amounting to $7000 or more, if not otherwise paid, and to remove the same from the record, and to deduct the same, and the cost and expenses of so doing, from the unpaid balance of the purchase price, and that he may have such other and further relief as equity may require.

The answer of the Lord Lumber and Fuel Company alleged that it, acting through W. A. Draper as its agent, entered into negotiations with appellee and Ben Dial and agreed with them to sell said property to appellee for $18,000, payment to be made by appellee as alleged in his bill, but that it was the agreement of the parties to the contract that appellee was to accept the title to the property subject to all general taxes levied after the year 1929 and subject also to all installments of special assessments falling due after the execution of the written contract of sale, and that the general taxes on the property for the year 1930 "should be prorated as of the date of delivery of the deed;" that by a mutual mistake of the parties the written contract, which

was drafted by a real estate broker who represented both appellee and the vendor and executed by the parties, failed to provide that the property was sold subject to all installments of special assessments which would fall due after the execution of the contract and failed to provide that the general taxes on the property for the year 1930 were to be prorated as of the date of delivery of the deed, and that the company was ready, willing and able, and had offered, to perform and carry out the agreement as actually intended to be made by the parties. The appellant W. A. Draper in his answer to the bill alleged that he on his own behalf had entered into no contract for the sale of the real estate to appellee and that he had no interest in the real estate.

The allegations of the cross-bill of the Lord Lumber and Fuel Company, so far as they need be noticed, are, in substance, the same as those of its answer above set out, and the prayer of the cross-bill is that the written contract be reformed so that it will contain the omitted agreement of the parties thereto that appellee should assume the payment of all the special assessments that would fall due after the date of the contract, and that the general taxes for the year 1930 should be prorated as of the date of the delivery of the deed to the premises. It also contains a prayer for general relief.

The master found that on the date of the execution of the contract there were certain special assessments against the real estate for local improvements that had been completed and that the installments of the special assessments payable after the date of the contract aggregated approximately $7000; that the proof was insufficient to warrant a reformation of the contract so that it would provide that appellee should assume the payment of installments of special assessments for improvements completed which fell due after the execution of the contract; that it was the intention of the parties to the contract to include therein a

provision that the general taxes on the property for 1930 should be prorated between the parties as of the date of the delivery of the deed under the agreement but through a mutual mistake of the parties no such provision was inserted in the written contract. The master recommended that the prayer of the cross-bill, in so far as it asked a reformation of the contract by adding thereto a provision that the general taxes on the property for 1930 be prorated between the parties, be granted, but that the other relief asked by cross-complainant be denied and that a decree of specific performance of the contract as so reformed be entered. The decree of the circuit court was in conformity with the recommendations of the master.

The written contract for the sale of the property in question was signed in the office of McClintock & Prouty, real estate brokers in Hinsdale. There were four persons present at the time the parties met there to finally agree on the terms of the contract and to have it written and signed by the parties to it. These four persons were present during the entire time the terms of sale were verbally discussed and while it was being drawn by H. George Prouty, of the firm of McClintock & Prouty, and until it was written up and signed and delivered. Those four persons were appellee, W. A. Draper, who signed the contract on behalf of the Lord Lumber and Fuel Company, (hereafter referred to as the company,) H. George Prouty and C. J. Weber, who was a real estate broker associated with Prouty, of McClintock & Prouty. They were the only witnesses who testified in this case except John C. Fetzer, who was a real estate man living in Hinsdale with offices in the Loop in Chicago, all of whom, except appellee, were called as witnesses for the company. It is conceded in this court by the company that the express terms of the contract signed by appellee and the company cannot be legally interpreted as requiring appellee to pay the $7000 or more special assessments. The record shows an admission by appellee and

the company that the property was encumbered by the special assessments and the mortgage for $5500 and that the special assessment improvements had been completed at the date of the written contract. The testimony of appellee and of the four witnesses for the company which is material to the issues in this case is in substance the following:

Appellee testified that he drove in a car to McClintock & Prouty's office and made a contract with them to buy the property. He bought it for himself entirely and had no agreement with Dial to buy it for him or to buy it jointly with him. Before he signed the contract nothing was said about assessments. They were not mentioned in his presence. The mortgage lien for $5500 was mentioned. Prouty read the contract and "we" read it individually. He made a few suggestions for correction as to the payment of the two checks and as to the wording of the mortgage for $5500. "I then said, 'I suppose we will prorate the general taxes.'" The verbal agreement was that the general taxes would be prorated. The special assessments were not mentioned during the whole time he was in the office. He found out the special assessments were on the property when the abstract was examined by the Chicago Title and Trust Company and reported to Fetzer. He visited the property prior to his negotiations for the purchase of it, and the parties in possession who claimed to own it informed him that there were some of the assessments that were not paid out and that there were a number of payments made on the assessments. He would have presumed that there were assessments against the property and unpaid installments thereof if those men had not given him that information. He said nothing about special assessments at the time the contract was being made. He was satisfied with the contract. It was specific. He would not have bought the property and agreed to pay the special assessments without knowing what they were for and how much they were. There was never a word spoken to him about special assessments of any

kind or character until he walked into Fetzer's office on June 30 to meet Draper and make the tender of payment for the property. From that time Fetzer was looking after his interests in the closing of the transaction. He had never met him until after the signing of the contract.

William A. Draper's testimony is, in substance, that he met appellee for the first time in McClintock & Prouty's office on Saturday, June 28, 1930, the day the written contract was signed; that appellee said that he was there to negotiate for the purchase of the property about which Dial had talked and would like to take up the offer made to Dial; that witness told appellee the best price "we would make" on the property would be $18,500, less the first mortgage, which appellee was to assume, plus the unpaid installments of the special assessments; that appellee then said he would not pay that much for the property but would pay $18,000; that witness then asked him if a commission was to be paid to Fetzer, and appellee said "no." Witness then said "we" will then be able to sell the property for $18,000, and appellee agreed to that price; that it was further agreed that appellee was to pay $2000 as earnest money—$1000 on that day and $1000 the next Monday, when the contract was to be closed; that "we" then agreed that Weber would meet appellee in Chicago and collect the other $1000 on Monday, and that it was also agreed that the general taxes and the interest on the mortgage were to be prorated up to the day the contract was to be closed and the deed delivered. Draper further testified, in substance, that Weber told Prouty to draw up the contract. Prouty, while writing the contract, asked "us" questions from time to time. When he had finished writing the contract he showed it to "us" and "we" each looked it over. Witness asked for some changes to be made in regard to the payment of the other $1000 of earnest money. Appellee asked for a change to be made in the description of the mortgage. The contract was re-written on a new sheet and

the changes suggested were made. While the contract was being drawn there was discussion relative to special assessments. Appellee asked about the payment of the unpaid installments. Prouty replied, "You understand that the unpaid installments are to be assumed by the buyer?" Appellee said, "Yes, and I presume the general taxes are to be prorated," and Prouty said "yes." Appellee left one check with Prouty as earnest money, to be held until Weber met appellee in Chicago and collected the other $1000. "The next time I met appellee was at Chicago, at Mr. Fetzer's office." Fetzer said to witness, "Under this contract you are to pay the special assessments, aren't you?" and witness replied, "No; Mansell is to pay all the unpaid installments on the special assessments." Fetzer then said, "That is not according to the terms of the contract." Witness said: "Yes, it is; that is my understanding of it." Fetzer produced a copy of the contract. Witness read it and saw that the assessments were not fully covered in it, and said it was "our" understanding that the unpaid installments of the special assessments were to be assumed by the buyer and "we" would not sell the property under any other terms. Fetzer asked appellee if he understood that the special assessments were to be paid by the company, and appellee said, "Yes; * * * but the general taxes were to be prorated up to the day of closing." Witness then said the general taxes were to be prorated and that the interest on the mortgage was to be prorated and that the installments of the special assessments that were not due were to be paid by the purchaser. They are all conditions that "we" agreed on between ourselves at the time we signed the contract. Witness further stated that that was the first time he had learned that those conditions were not in the contract, and that he had drawn a deed and that those conditions were in that deed which he had and was ready to deliver, and he showed the deed to Fetzer. He also stated that he did not thoroughly read the entire contract, the

printed as well as the typewritten portions, and that he principally read and discussed the typewritten part.

Prouty and Weber both corroborated Draper in his testimony to the effect that appellee asked during the verbal negotiations who was to pay the special assessments, and that Prouty informed him that all special assessment installments that were due would be paid by the company and that the special assessments that were not due were to be paid by appellee. They also both testified that they did not know that those provisions were not in the written contract until they were so informed by Fetzer. Prouty further testified that it was his intention to put a clause in the written contract showing that the special assessments not due would be assumed by appellee. He further stated that in his telephone conversation with Fetzer a few days after the contract was signed Fetzer informed him that it was provided by the contract that the company was to pay the special assessments and that he then informed Fetzer that it did not so provide. He also testified that he probably said in that telephone conversation that the contract would be carried out exactly as drawn.

Fetzer testified that he requested and received from Prouty a copy of the written contract; that after he had examined the copy he telephoned appellee to come to his office; that he called Prouty on the telephone and informed him that he had examined the copy of the contract and that it provided that the special assessments were to be paid by the seller; that Prouty replied, "The matter will be closed, Mr. Fetzer, just in accordance with that contract;" that he later met Prouty, who said to him, "That contract is drawn like I draw all our contracts;" that Prouty further said that he had always written the contracts for the company just like the contract in question was written; that when he and appellee met Draper and Weber in his office he told Draper that the special assessments were to be paid by the company and showed his copy of the contract to

Draper; that Draper said to him that it was not his under-standing that the company was to pay the assessments; that witness then said to him: "We won't settle it on my un-derstanding or yours. We will submit it to the Chicago Title and Trust Company, if you will agree to abide by their decision;" that Draper replied that he would not agree to anything until he consulted his attorney, and that Draper later informed him that he had decided to stand on his interpretation of the contract; that appellee then said that he would insist upon the contract being carried out, and that Cameron, his attorney, made a formal tender for appellee by a certified check for $10,500 to Draper.

It clearly appears from the evidence in the record that the company authorized Draper to sell and deed the prop-erty in question for the net sum to the company of $12,500 to be paid by the purchaser, and that for that net sum the buyer was to accept a deed to the premises subject to the amount due on the $5500 mortgage and to the $7000 or more of the special assessments that were to become due after the delivery of the deed and which were for local improvements that were completed before the contract of sale was made, and that the general taxes then levied and unpaid and the interest on the $5500 mortgage and the rents of the premises were all to be prorated as of the date the contract should be consummated. The written contract clearly expresses all of the terms of the contract that Draper was authorized to make by the company except the provi-sion that appellee was to assume and pay the $7000 or more of the assessments that were to become due after the deed was delivered and except the provisions that the general taxes then levied and the interest on the $5500 mort-gage were to be prorated. The contract as written provides that appellee is to be entitled to the rents, if any, from the time of delivery of the deed. Appellee concedes that un-der the verbal agreement made before the contract was writ-ten the written contract should contain all the provisions

which the company authorized Draper to make, except the provision that he was to assume and pay the special assessments. While the evidence does show, beyond all reasonable doubt, that the written contract does not contain all the material provisions of the contract verbally agreed upon by the parties, our holding must be that the evidence does not clearly and satisfactorily show that the company is entitled to have the relief prayed for by it in its cross-bill and that it is not equitably entitled to a rescission or cancellation of the contract. Equity will reform an instrument only where the mistake is one of fact and is mutual and common to both parties. (*Schaefer* v. *Henze,* 337 Ill. 41; *Skelly* v. *Ersch,* 305 id. 126.) The evidence of a mutual mistake must also be of a strong and convincing character and such as will strike all minds alike as being unquestionable and free from reasonable doubt. A probability or mere preponderance of the evidence is insufficient. *Christ* v. *Rake,* 287 Ill. 619; *Anderson* v. *Stewart,* 281 id. 69.

The evidence also clearly shows that appellee was well informed by the verbal discussions before the contract was signed that Draper, acting for the company, intended that the written contract should provide that appellee was to assume and pay the special assessments, and that he knew at the time of the signing of the contract that it did not so provide and that he knew that Draper and Prouty thought that the written contract did so provide. If appellee was not well informed of the facts, why did he procure the services of Fetzer after the contract was written and delivered and have Fetzer so promptly render for him the character of services he rendered, both before and immediately after Fetzer gave Draper and Prouty the first information they had that the contract did not provide that appellee should assume and pay the special assessments? Under the evidence appellee is not entitled to have specific performance of the contract. The remedy of specific performance of a contract is not granted as an absolute right, and it will be

denied where the contract was entered into because of fraud, oppression or misrepresentation or in a case in which it would be inequitable to enforce the terms of the contract. Where application is made to a court of equity for the specific performance of a contract the relief will sometimes be denied where a mistake has been made in entering into the contract and the facts and circumstances shown by the evidence are not sufficient to warrant the reformation or cancellation of the contract. (*Chute* v. *Quincy*, 156 Mass. 189, 30 N. E. 550; *Frisby* v. *Ballance*, 4 Scam. 287; 6 Pomeroy's Eq. Jur. (3d ed.) sec. 781, the same being a supplementary volume of that edition entitled Pomeroy's Equitable Remedies, vol. 2.) The substance of said section of Pomeroy is the following: When the complainant knows of the defendant's mistake or must reasonably suppose a mistake has been made, the circumstances are often such that the complainant cannot equitably ask a court of chancery to force a hard bargain, due to this mistake, on the defendant. A mistake which in itself might not be sufficient ground to save the defendant from his bargain may often protect the defendant when the complainant knew of the advantage he was getting when the contract was made. A number of other authorities are cited in foot-notes, including *Chute* v. *Quincy, supra.* This section of Pomeroy is very applicable to the case now before us. The total cash consideration, including the mortgage appellee was to pay, was $18,000. The amount of the assessments was $7000 or more, and was more than one-third of the actual cash consideration that was to be paid according to the intention of the company. In real estate transactions it is commonly known as a regular practice to sell real estate encumbered by such assessments subject to the same and to specify in the deed that the conveyance is subject to them. As the evidence shows so clearly that appellee knew that Draper and Prouty had intended to make the conveyance subject to the assessments, it would not be equitable for a court of equity, in

a proceeding by him for specific performance, to grant the relief prayed and thereby subject the company to a loss so great because of a mistake of its agent in drawing the contract. Appellee should therefore be left to pursue his remedy at law, in case he shall be advised that he has such remedy.

For the reasons aforesaid the decree of the circuit court will be reversed and the cause remanded, with directions to dismiss complainant's bill and the cross-bill for want of equity. *Reversed and remanded, with directions.*