ROBERT STOFER *et al.*, Plaintiffs-Appellants, v. FIRST NATIONAL BANK OF EFFINGHAM *et al.*, Defendants-Appellees.

Fifth District No. 5—89—0626

Opinion filed April 11, 1991.—Rehearing denied May 28, 1991.

McGaughey & McGaughey, of Lawrenceville, and Gundlach, Lee, Egg-mann, Boyle & Roessler, of Belleville (Guy E. McGaughey, Jr., and Timothy S. Richards, of counsel), for appellants.

Wildman, Harrold, Allen & Dixon, of Chicago (Richard P. Glovka, Thomas E. Patterson, and Robert T. Gruenberg, of counsel), for appellees Bernard O. Nelson, Jack W. Graham, and Paul Stockman.

Mitchell K. Shick, of Harlen Heller, Ltd., of Mattoon, for appellees First National Bank of Effingham, Eugene E. Gibson, George G. Danks, Leonard H. Dust, Max H. James, James R. McDaniel, Frank H. Schniederjon, Paul F. Taylor, and Lowell D. Samuel.

JUSTICE WELCH delivered the opinion of the court:

Plaintiffs, Robert and Marcia Stofer, appeal from summary judgment entered by the circuit court of Effingham County on August 14, 1989, in favor of defendants, First National Bank of Effingham, Bernard O. Nelson, Sam P. Sgro, Jack W. Graham, Eugene E. Gibson, George G. Danks, Leonard H. Dust, Max H. James, James R. McDaniel, Frank H. Schniederjon, Paul F. Taylor, Lowell D. Samuel, Norbert R. Pudenz, and Paul Stockman. The court entered summary judgment in favor of all defendants although only Nelson, Graham and Stockman had filed a motion for summary judgment. The remaining defendants except Sgro had filed a motion to dismiss plaintiffs' second amended complaint. The complaint as amended alleged in its five counts the following causes of action: intentional interference with the right to dispose of one's property, tortious interference with a business expectancy of economic gain with plaintiffs' dealership customers, tortious interference with franchise contracts between plaintiffs and General Motors (GM), conspiracy, and tortious interference with plaintiffs' contractual relationship and business expectancy with their two corporations. The bases for summary judgment which Nelson, Graham, and Stockman argued and with which the court below agreed, were collateral estoppel as a result of and judicial admissions of plaintiffs in *United States v. Bob Stofer Oldsmobile-Cadillac, Inc.* (S.D. Ill. Oct. 8, 1987), No. 83—4086, one of the many cases which this unfortunate set of facts has engendered. Because resolution of the issues plaintiffs raise on appeal turn upon the Federal courts' opinions in *United States v. Bob Stofer Oldsmobile-Cadillac, Inc.* (S.D. Ill. Oct. 8, 1987), No. 83—4086, *aff'd* (7th Cir. 1988), 853 F.2d 1392, our recitation of facts shall be based on transcripts of testimony therefrom and the findings of fact in the judgment orders therein, both of which have been made part of the appellate record in the instant case.

Plaintiffs operated an automobile dealership known as Bob Stofer Oldsmobile-Cadillac, Inc., and an automobile leasing company known as ROLA, Inc., in Effingham, Illinois, for a number of years. Plaintiffs were the sole shareholders in each corporation. Plaintiffs individually owned the business real estate which they in turn leased to the

corporations. Their personal residence and the business property were mortgaged to the Small Business Administration to secure a $667,000 mortgage note. The First National Bank of Effingham as well as the Effingham State Bank held used- and leased-car inventory of the two corporations as security for other loans to plaintiffs. In May 1982, after agents of First National Bank of Effingham had come to the dealership to check collateral, plaintiffs admitted to the bank's president, Eugene Gibson, that they had sold certain vehicles which were part of the banks' security without turning over the proceeds thereof to reduce their debt with the banks.

Gibson called a meeting between plaintiffs and representatives of the two banks. Gibson and Danks represented First National, and Jack Graham and Frank Kabas represented Effingham State Bank. Plaintiffs confessed to the bank representatives that the amount of collateral sold "out of trust" was approximately $200,000 but that they had found it necessary to apply the collateral proceeds to other expenses in order to keep the two corporations afloat. The parties concluded at the end of this meeting that it was in their respective best interests to keep the businesses viable for the time being, but the banks would require plaintiffs to agree to certain supervision and to put up substitute collateral. The dealership operations would be supervised by Graham, who had formerly operated a Chrysler franchise, and his assistant Paul Stockman, and Graham's name was to be added as a required signature to the corporate checking accounts. Plaintiffs were also required to place both the business property and their personal residence in a land trust with the First National Bank as trustee and holder of the beneficial interest. Plaintiffs testified at the Federal trial and allege in the instant complaint that they only agreed to the banks' demands because they were threatened with involuntary bankruptcy, with the bringing of criminal charges, and that they could have their children taken from them. The Federal court found that at this point in time it was clear that the Stofers were in the midst of a serious financial crisis, that the banks were exerting a fair amount of pressure on them to come up with a method of insuring solvency or finding someone willing to support or buy the business, that the seriousness of the actions of selling off secured automobiles without paying off the obligations was driven home hard to the Stofers by bank representatives, and that the banks were concerned that a sizable investment was about to go under and were searching for a method to save it.

Robert Stofer contacted Sam Sgro, an acquaintance from Springfield, Illinois, in the automobile business, to see if he would be inter-

ested in investing in the dealership. Although Sgro decided not to invest in the corporation, he was interested in purchasing it. In this regard, he and Bernard Nelson, another automobile dealer, met with Stofer to discuss a sale of the business to them. The negotiations involved a sale of the corporate stock and contemplated transfer of all assets, including the business property, in return for assumption of all liabilities. When negotiations broke down during the first week of July 1982, Eugene Gibson of the First National Bank served as an intermediary among the parties. Gibson arranged for the bank's attorneys to prepare the purchase contracts and reassured the attorney drafting the agreements that Stofer had agreed to cooperate in gaining an award of the General Motors franchise to the buyers. Plaintiffs' franchise agreement disallowed an outright transfer of the franchise and provided that if there was a transfer of ownership the franchise agreement would terminate.

Plaintiffs were represented in the negotiations after July 4, 1982, by their present attorney, Mr. McGaughey. The banks were putting considerable pressure on the Stofers to sell the business, and McGaughey was brought in to counter the pressure. McGaughey kept in very close contact with the Stofers during the negotiations. He was successful in obtaining a cash payment of $20,000 for the Stofers as part of the final agreement, which was executed on July 8, 1982. In this agreement, plaintiffs deeded their interest in three parcels of real estate described in the agreement and transferred the stock of both corporations in exchange for the cash payment of $20,000 and an assumption and indemnification agreement by Sgro and Nelson for all liabilities, including the Small Business Administration mortgage.

Sgro became disenchanted with the agreement shortly after its execution because he felt Stofer had misrepresented the amounts of certain business liabilities. In order to prevent a collapse of the deal, Gibson was successful in convincing Jack Graham to step in. Sgro and Nelson assigned all their interest as buyers in the July 8, 1982, agreement to Graham, with Nelson agreeing to operate the dealership in exchange for an opportunity to purchase stock from generated profits.

Although Bob Stofer initially cooperated with Sgro and Nelson in their application to obtain a transfer of the General Motors franchise, his attitude abruptly changed in late July 1982. This change of attitude coincided with his discovery that Sgro and Nelson transferred their interest to Graham and that the legal description on the deed did not include the description for the business property. The misdescription was initially made on the land trust deed, and the attorney

drafting the purchase and sale documents was told to use the same description. Stofer told GM representatives that he was forced into transferring the business under threats of going to jail. Attorney McGaughey wrote to General Motors and threatened suit if a franchise was granted to Graham and Nelson. General Motors in turn rejected Graham and Nelson's franchise application, and in February 1983 they decided to wind down the business.

McGaughey also demanded rent for use of the business property and eventually filed suit on behalf of the Stofers to evict Graham and Nelson. Graham and Nelson in turn sued to reform the contract because of a mutual mistake as to the failure to include the legal description of the business property on the deed and for interference with their application for the General Motors franchise. Because of the confusion over the transfer of the business real estate, Graham and Nelson refused to make the mortgage payments to the Small Business Administration, which sued to foreclose the mortgage and for a resulting deficiency judgment against the Stofers in *United States v. Bob Stofer Oldsmobile-Cadillac, Inc.* (S.D. Ill. Oct. 8, 1987), No. 83—4086. The Stofers cross-claimed against Graham and Nelson seeking indemnification against the deficiency judgment in the foreclosure suit pursuant to the July 8, 1982, agreement.

After a five-day bench trial in Federal district court, the court ruled that the Stofers could not in equity be granted specific enforcement of the indemnification provision of the agreement because of the equitable doctrine of unclean hands. The court found that the conduct of Bob Stofer and his attorney in preventing the award of the GM franchise to Graham and Nelson, effectively making certain that the business could not be operated successfully, was outrageous. It also found incredible plaintiffs' testimony that the business property was never intended to be deeded by the agreement and held that there was a mutual mistake of fact as to this point. However, because the parties could not be placed in the status quo, it further held that rescission was an inappropriate remedy. The Federal court noted that in the instant State court case plaintiffs were pleading that the agreement was unenforceable because it was signed under duress and threats and commented, "the evidence is clear that in regards to the contract the Stofers have taken positions on whichever side of the fence they viewed as most advantageous at the time." Moreover, on the eve of trial plaintiffs had moved to amend the cross-claim to add a count for breach of contract, which motion the court denied in the judgment order.

Plaintiffs appealed this decision to the Seventh Circuit Court of Appeals, arguing that the district court's finding of a mutual mistake of fact was not supported by the evidence, that they never intended to transfer the business real estate and so Nelson and Graham were operating under a unilateral mistake of fact, which could not serve as a basis to rescind the contract. They further argued that there was no evidence that they came to equity with unclean hands because there was nothing in the agreement requiring them to assist Graham and Nelson in obtaining the franchise and that as the alleged mutual mistake was unrelated to their conduct involving the franchise, the unclean hands doctrine could not serve to bar their right to specific performance of the indemnification provision. The seventh circuit disagreed, however, and affirmed the decision of the district court, holding that the evidence supported a finding of mutual mistake as to the business real estate and that rescission was inappropriate. It also agreed that specific performance could not be granted because of plaintiffs' unclean hands, although for what it found to be a more compelling reason than the interference with the attempt to obtain the GM franchise:

"The Stofers attempted to take advantage of what they must have known was a mutual mistake in the contract. Realizing that they still held title to the commercial real estate, the Stofers charged Graham rent for its use rather than pointing out the error in the legal description. The Stofers' attempt to collect rent was nothing less than disingenuous in light of the fact that Graham was to pay the mortgage on the real estate. In fact, in a move, which can only be characterized as brazen, the Stofers threatened to file an action for eviction. ***

For reasons which were primarily based on personal animosity, Mr. Stofer determined that he simply did not want Mr. Graham to have his old business." *United States v. Bob Stofer Oldsmobile-Cadillac, Inc.* (7th Cir. 1988), 853 F.2d 1392, 1398.

We note at this point that the instant case was filed by plaintiffs in March 1984. After a pretrial conference in August 1986, the court ordered the cause transferred to the inactive docket due to the pendency of the above-named Federal case "with same parties and issues." Defendants Graham, Nelson, and Stockman filed their motion for summary judgment following the seventh circuit's affirmance of the district court, attaching copies of both the district court's and appellate court's opinions to the memorandum in support thereof and noting that the Stofers took no further appeal of the decision. They also attached, as an exhibit, portions of the transcript of Mr. and Mrs.

Stofers' testimony from the trial. The Stofers filed a memorandum in response to the motion, also attaching portions of their testimony in Federal court.

Graham, Nelson and Stockman argued in their motion that because plaintiffs voluntarily sold their dealership on July 8, 1982, they had no basis for a claim of tortious interference with business expectancies or any contracts arising from the dealership, and as they had no claim for tortious interference, they could not have a claim for conspiracy based on tortious interference. Therefore, these defendants argued, there was no genuine issue of material fact and they were entitled to judgment as a matter of law. They further argued in their memorandum of law that plaintiffs' Federal court testimony constituted an admission that they signed the July 8, 1982, agreement voluntarily, with the advice of counsel and without duress, and that the Federal court implicitly found that the contract was valid in reaching the decision that the plaintiffs would be denied specific performance of one of the contract terms because of their unclean hands. They argued that summary judgment was proper either because the independent testimony of the Stofers demonstrated that they had entered the contract voluntarily or because the factual issue critical to this case was resolved in the Federal litigation. The court below agreed:

"A final judgment was rendered in the federal case, finding the contract of July 8, 1982, to be voluntarily and knowingly entered into by the parties thereto, that a valid contract existed as of July 8, 1982, but incorporating a 'mutual mistake' as to the description of the real estate to be conveyed. The Stofers cannot now be heard to claim the contract of July 8, 1982 is not valid, based on their claims of duress preceding the consummation of the agreement and which duress compelled and coerced them into entering into the contract. The Stofers are collaterally estopped by the final judgment of the Federal Courts from claiming that contract to be invalid—or that the contract was not voluntary on their part."

The court found that there was no genuine issue of fact presented in any of the counts giving rise to any possible claim of tortious interference or conspiracy to commit tortious interference and, based on collateral estoppel of the above issue, entered summary judgment for defendants on all five counts of the second amended complaint.

We will first address the issue of whether the court below factually and legally misapplied the doctrine of collateral estoppel. Plaintiffs contend that the Federal district court did not find that the July 8, 1982, agreement was valid and enforceable or even address the is-

sue of whether the Stofers executed the agreement as a result of pressure put upon them by the defendants. Instead, plaintiffs argue, the issues addressed were contract rescission based on mutual mistake and whether they were guilty of unclean hands such that the indemnification provision of the contract would not be specifically enforced. Moreover, they contend that as not all defendants were parties to the Federal action, collateral estoppel based thereon could not stand. As to this last proposition, only the party against whom collateral estoppel is asserted must have been a party or a privy of a party in the prior proceeding. (*Edwards v. City of Quincy* (1984), 124 Ill. App. 3d 1004, 1013, 464 N.E.2d 1125, 1132.) We therefore find that collateral estoppel was not misapplied by the court below on that basis.

■■ "The doctrine of collateral estoppel applies when a party or someone in privity with a party participates in two separate and consecutive cases arising on *different* causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction." (Emphasis in original.) (*Housing Authority v. Young Men's Christian Association* (1984), 101 Ill. 2d 246, 252, 461 N.E.2d 959, 962.) The adjudication of the fact or question in the first cause will, if properly presented, be conclusive of the same question in the later suit, but the judgment in the first suit operates as an estoppel only as to the point or question *actually litigated* and determined and not as to other matters which might have been litigated and determined. (*Housing Authority*, 101 Ill. 2d at 252, 461 N.E.2d at 962.) However, when an issue for which preclusion is sought through collateral estoppel is the only rational determination the fact finder could have made on record, then that issue is considered "determined" by the fact finder for the purpose of applying collateral estoppel, even if no explicit finding on the issue has been made. *Tamari v. Bache & Co.* (N.D. Ill. 1986), 637 F. Supp. 1333, 1336-37.

■■ ■ In the Federal trial, the Stofers sought specific performance of the indemnification provision in the July 8, 1982, agreement. A plaintiff must allege the existence of a valid and enforceable written or oral contract before the remedy of specific enforcement may be granted. (*Intini v. Marino* (1983), 112 Ill. App. 3d 252, 254, 445 N.E.2d 460, 463.) Moreover, specific performance of a contract is not granted as an absolute right, and it will be denied where the contract was entered into because of fraud, oppression, or misrepresentation or in a case in which it would be inequitable to enforce the terms of the contract. (*Mansell v. Lord Lumber & Fuel Co.* (1932), 348 Ill. 140,

151-52, 180 N.E. 774, 778.) In reaching the determination of whether to enforce the indemnification provision in this agreement, the Federal court necessarily had to recognize the validity of the agreement after determining whether the *prima facie* case for enforcement had been proved. Only then was proof of the defense of unclean hands evaluated. Therefore, plaintiffs could not take the inconsistent position at trial that the contract was induced by duress and maintain the action for specific performance.

██ ▌ A party cannot create a factual dispute, for purposes of a summary judgment motion, by contradicting a previously made judicial admission. (*Hansen v. Ruby Construction Co.* (1987), 155 Ill. App. 3d 475, 480, 508 N.E.2d 301, 303-04.) A judicial admission is a deliberate, clear, unequivocal statement of a party about a concrete fact within that party's peculiar knowledge. (*Hansen*, 155 Ill. App. 3d at 480, 508 N.E.2d at 303.) Marcia Stofer gave the following testimony about the July 8, 1982, agreement at the Federal trial:

"Q. Joint exhibit No.3. Is that your signature on page 2?

A. Yes it is.

Q. Did you sign that document?

A. Yes I did.

Q. Did you read it?

A. Yes.

Q. Beforehand?

A. Yes.

Q. Do you find any items in either joint exhibit No. 1 or joint exhibit No. 2 that you did not understand at the time that you entered into these documents?

A. No, sir.

Q. Did you sign them voluntarily?

A. Yes I did."

In addition, Mrs. Stofer agreed that she and her husband had input leading up to the execution of the agreement by way of their attorney, who "went over the documents before we signed them very carefully." She also admitted that they accepted the agreement:

"Q. And you were satisfied, were you not?

A. Like I told you, we decided we would take this. I can't tell you I was happy after walking away 17 years [*sic*] of my life but we accepted it."

Robert Stofer was asked about his position on the agreement for purposes of the specific performance action:

"Q. Your position in this Court, in this lawsuit, is that these two contracts, joint exhibits 1 and 2, were executed and delivered for fair and valuable consideration?

A. I guess that would be correct.

Q. And you're asking Judge Foreman to enforce joint exhibits 1 and 2, are you not?

A. Yes I believe that is correct."

When asked about the allegations in the instant case that the defendants wrongfully determined the terms and parties to the agreement and hired attorneys to draft said agreement all without the input, advice, or consent of the Stofers and that the agreement was entered into against their free will and judgment because of duress, but that this was not what he was asking the court to believe in the Federal trial, Mr. Stofer replied:

"A. It would appear not *** I signed them, but I didn't like to sign them. I didn't want to sign them, but I didn't see an alternative from the things they were using to threaten me."

Moreover, the Federal court order illustrates to us that the issue of coercion or duress practiced upon plaintiffs as alleged in the instant complaint was fully litigated in that trial. Judge Foreman's order recited, "[t]estimony at trial centered on the negotiations leading up to the agreement and the conduct of the parties both during negotiations and after the agreement was signed." Our independent review of the trial transcript from the Federal case, included by both plaintiffs and defendants as part of this record, indicates that the Stofers were given the opportunity to testify as to the alleged coercion or duress during the contract negotiation period. The doctrine of collateral estoppel generally precludes parties and their privies from relitigating facts in a subsequent action which were specifically litigated and determined in a prior action. (*Oberman v. Byrne* (1983), 112 Ill. App. 3d 155, 160, 445 N.E.2d 374, 378.) We also note that under the doctrine of election of remedies a vendor may not invoke a remedy based on affirmance of a contract and also invoke a remedy that is based on disaffirmance. (*Bruno Benedetti & Sons, Inc. v. O'Malley* (1984), 124 Ill. App. 3d 500, 506, 464 N.E.2d 292, 297.) The remedy plaintiffs seek in the instant case is pursuant to theory inconsistent with the specific performance or breach of contract remedy sought by plaintiffs in the Federal case, and the Federal courts made note of that in their respective opinions as well:

"[The] evidence is clear that in regards to the contract the Stofers have taken positions on whichever side of the fence they viewed as most advantageous at the time" (*United States*

*v. Bob Stofer Oldsmobile-Cadillac, Inc.*, No. 83—4086 at 17); "in an abrupt turn-about, Mr. Stofer went from the position that though unpleasant, the sale of his business was necessary—to the position that the sale was the result of duress and coercion" (*United States v. Bob Stofer Oldsmobile-Cadillac, Inc.*, 853 F.2d at 1398).

The circuit court offered the following comment concerning the duress and coercion issue by footnote:

> "There can be no doubt that the bank strongly urged Mr. Stofer to place his residential and commercial real estate into trust once it became apparent he was selling cars without applying the proceeds to his loan. Moreover, we appreciate the fact that—in the district judge's words—the bank, which had been less than rigid in enforcing the floor plan procedures, suddenly 'found religion' and decided to play it by the book. On the other hand, the bank and later, Sgro, Nelson, and Graham were willing to bail Mr. Stofer out of a bad situation and it can hardly be said that their actions were coercive." (*United States v. Bob Stofer Oldsmobile-Cadillac, Inc.*, 853 F.2d at 1398 n.2.)

We therefore find no legal or factual error on the part of the court below in determining that plaintiffs were collaterally estopped from maintaining that the July 8, 1982, agreement was invalid based on duress or not entered into voluntarily on their part.

■ The next issue raised by plaintiffs on review which we shall address is whether the court below erred in finding that no material issues of fact remained. The Illinois Code of Civil Procedure provides that summary judgment is only appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005.) A trial court's grant of summary judgment will not be reversed absent a showing of abuse of discretion such that plaintiffs' right to fundamental justice is violated. *Fearon v. Mobil Joliet Refining Corp.* (1984), 131 Ill. App. 3d 1, 5, 475 N.E.2d 549, 553.

The court below found that there were no material issues of fact remaining because plaintiffs were collaterally estopped from maintaining that they did not freely and without duress enter into the agreement to sell their business, which agreement effectively eliminated the contractual relationships and expectancies with which plaintiffs alleged interference on the part of the defendants. Plaintiffs maintain on appeal, however, that the appropriate time for the court to have

assessed the interference was the time period beginning with the bank conference, leading up to the execution of the agreement, where they were threatened, not the date of the execution of the agreement, which is the time when the contract defense of duress is measured. While they may not have signed the contract under duress, plaintiffs argue that the conduct alleged in their complaint during the preceding period stated a cause of action for tortious interference, to wit:

(a) called the Stofers into a series of meetings, and without reasonable or justifiable cause threatened and intimidated the Stofers with criminal prosecution, jail, economic ruin, involuntary bankruptcy, and the prospect of their children being placed in the custody of the State of Illinois, all on account of debt owed by the Stofers and their corporations to defendant bank;

(b) threatened and intimidated the Stofers, causing the stock of the Stofers' corporations to be wrongfully and physically taken from the Stofers, held by the defendant bank, and later delivered to defendant, Jack Graham;

(c) wrongfully forced the Stofers to sign a blank note running in favor of the defendant bank;

(d) wrongfully forced the Stofers to deliver keys to the automobile business to Jack Graham;

(e) wrongfully appointed Jack Graham and Paul Stockman to "oversee" the operation of the Stofers' corporations;

(f) wrongfully forced the Stofers to consent to the execution of a signature card which prevented the Stofers from writing checks on their corporate checking accounts with defendant bank without the co-signature of defendant Jack Graham or his authorized agent, defendant Paul Stockman, thereby wrongfully preventing the Stofers from operating their automobile business on a day-by-day basis;

(g) wrongfully accelerated the maturity dates of certain promissory notes of the Stofers' corporations and demanded immediate payment thereon from the Stofers;

(h) under an alleged right of "set-off" wrongfully wiped out personal and corporate accounts which the Stofers maintained with defendant bank;

(i) wrongfully negotiated and arranged the execution of the so-called agreement of July 8, 1982, whereby all the Stofers' interests were transferred to Sam Sgro and Bernard Nelson, said agreement being the result of defendants' threats and exploitation of the uneven bargaining positions.

Thus plaintiffs argue questions of fact remained as to whether the conduct alleged during this period preceding the July 8, 1982, agreement constituted tortious interference with their contractual relationships or business expectancies and conspiracy.

■■ Plaintiffs further maintain that elements of an intentional interference claim do not include proof that the defendants' conduct rose to the level of duress that would void an otherwise valid contract. They argue that the court below erred in reading into the elements of the tortious interference claim a requirement that defendants' conduct must equal such duress as would make the contract voidable. The elements of a tortious interference claim are: (1) that the plaintiffs have a valid business relationship expectancy, or contract with a third party; (2) that the defendants know of that expectancy, relationship, or contract; (3) that the defendants have intentionally interfered with that expectancy, relationship, or contract inducing or causing a breach or termination of the expectancy, relationship, or contract; and (4) that the interference has caused damage to the plaintiff. (*Mucklow v. John Marshall Law School* (1988), 176 Ill. App. 3d 886, 895, 531 N.E.2d 941, 947 (business expectancy); *R.J.N. Corp. v. Connelly Food Products, Inc.* (1988), 175 Ill. App. 3d 655, 664-65, 529 N.E.2d 1184, 1190 (contractual relation).) In addition, lack of legal justification for inducing the breach is an essential element in stating a cause of action for tortious interference with contractual relations. *R.J.N. Corp.*, 175 Ill. App. 3d at 664, 529 N.E.2d at 1190.

■ As Nelson, Graham, and Stockman note in their brief to this court, the cornerstone of each of the five counts making up the second amended complaint is the allegation that the July 8, 1982, agreement to sell the corporations was obtained through coercion and that plaintiffs would not have entered into the agreement but for the duress under which they were placed by the bank. Indeed, in plaintiffs' response to defendants' motion for summary judgment, they recite that the amended complaint alleges that Graham, Nelson, and Stockman intentionally and maliciously conspired with the bank to exert economic duress and intimidation resulting in the Stofers' entering into an agreement whereby they sold their dealership corporations to defendants Nelson and Sgro and that the entire scheme was calculated to deprive the Stofers of their property and automobile franchise. We are therefore unconvinced by plaintiffs' argument as to time period of the conduct that the economic duress or intimidation alleged by plaintiffs as the interference conduct is any different from the definition of the contract doctrine of duress. Duress is a condition where one is induced by a wrongful act or threat of another to make a con-

tract under circumstances which deprive one of the exercise of free will; wrongfulness is not limited to acts that are criminal, tortious, or in violation of a contractual duty but extends to acts that are wrongful in the moral sense. (*Enslen v. Village of Lombard* (1984), 128 Ill. App. 3d 531, 533, 470 N.E.2d 1188, 1190.) That they involuntarily sold the businesses because of defendants' threats is precisely what plaintiffs alleged and precisely what they testified to in the Federal case: "I signed them, but I didn't see an alternative from the things they were using to threaten me." Accordingly, we do not believe the trial court was reading into the elements of the torts alleged that defendants' conduct had to constitute duress, but was merely making a conclusion that a finding of duress was inconsistent with the proof at the Federal trial because plaintiffs voluntarily entered into the contract.

Plaintiffs, however, contend that the tort claims may stand even if the alleged duress was insufficient to void the contract because the exertion of superior economic position to bring about modifications and changes in contractual relationships is actionable, citing *Hannigan v. Sears, Roebuck & Co.* (7th Cir. 1969), 410 F.2d 285, and *Stevens v. Tillman* (N.D. Ill. 1983), 568 F. Supp. 289, in support of this proposition. Plaintiffs' reliance on these two cases for said proposition is misplaced. In *Hannigan*, the individual and corporate plaintiffs alleged that Sears wrongfully and intentionally interfered with their contract with a third party by inducing the third party to amend its contract with the individual plaintiff, coercing him into involuntarily agreeing to such amendment. The Federal court found that there was sufficient evidence that Sears intentionally interfered with plaintiffs' contractual rights even though the contract was not breached with the third party but merely modified to plaintiffs' detriment. (*Hannigan*, 410 F.2d at 290-91.) In *Stevens*, a white school principal charged members of a black parents' group from her assigned school with tortious interference when their boycott and demonstrations at the school and complaints to the school board resulted in a medical condition of high blood pressure, forcing her to take a leave of absence and ultimately to accept a reassignment by the board to another school. (*Stevens*, 568 F. Supp. at 291.) We note that in both cases the issue was not whether the plaintiffs voluntarily determined to terminate or modify their contracts in spite of the pressure placed upon them by the defendants, but whether defendants caused a breach of plaintiffs' contracts with third parties, one of the elements of the tortious interference claim. In fact, the court in *Hannigan* found plaintiffs to be in an extremely involuntary position because if plaintiff had refused to

assent to the contract modification proposed by the third party, the third party would have lost all of Sears' business and would have been forced out of business with the result that plaintiffs would have had no manufacturer for their product. (*Hannigan,* 410 F.2d at 291.) Moreover, as defendants note in their brief, although the district court originally held in the *Stevens* case that plaintiff stated a cause of action for tortious interference with a contractual relationship for purposes of a motion to dismiss, a directed verdict in favor of defendants was upheld on subsequent appeal, plaintiff having failed to establish that there was a breach of a contract with a third party because the superintendent and school board had an absolute statutory right to transfer the principal to another school. *Stevens v. Tillman* (N.D. Ill. 1986), 661 F. Supp. 702, 712, *aff'd* (7th Cir. 1988), 855 F.2d 394.

Summary judgment should be rendered with great caution; however, where a plaintiff fails to establish an element of the cause of action through the pleadings, depositions, admissions, and affidavits filed, summary judgment for the defendant is proper. (*Taylor v. Hocker* (1981), 101 Ill. App. 3d 639, 641, 428 N.E.2d 662, 664.) We must conclude that plaintiffs failed to establish interference on the part of defendants equal to duress as would render the July 8, 1982, agreement invalid, because plaintiffs admitted that the contract was entered into voluntarily and because plaintiffs were collaterally estopped from maintaining in this action that the agreement was the result of duress practiced upon them by defendants. Plaintiffs have alleged in count I that defendants intentionally interfered with their operation, ownership, and right to dispose of their automobile dealership and leasing company. To the extent that this is a separate tort from tortious interference with a contractual relationship or business expectancy, we also hold that defendants' interference with plaintiffs' right to deal with the dealership and leasing company was not proved because plaintiffs are collaterally estopped from denying that the companies were voluntarily transferred.

■ We also note as alternate grounds for upholding the decision of the court below that plaintiffs failed to allege that defendants' conduct caused a *third party* to breach a contractual relationship or abandon a business expectancy with plaintiffs. Plaintiffs' complaint alleged that defendants' conduct caused them to execute the July 8, 1982, agreement which terminated contractual relationships, their franchise with General Motors and their interest in the two corporations as well as the prospective economic advantage with loyal automobile customers. The torts of interference with contractual relations and interference with prospective business advantages both require

action toward a *third party* which results in interference with said contract or prospective relationship. (*Laser Industries, Ltd. v. Eder Instrument Co.* (N.D. Ill. 1983), 573 F. Supp. 987, 994; accord *Galinski v. Kessler* (1985), 134 Ill. App. 3d 602, 480 N.E.2d 1176 (tort of interference with prospective economic advantage requires action by interferer directed towards a third party).) This argument was made by defendants in their reply to plaintiffs' response to the motion for summary judgment, and although not relied on by the court below in reaching its decision to grant summary judgment for defendants, the reviewing court may sustain a decision of the trial court on any grounds appearing of record in the court below. (*Estate of Johnson v. Condell Memorial Hospital* (1988), 119 Ill. 2d 496, 520 N.E.2d 37.) While plaintiffs in their brief cite the *Stevens v. Tillman* case for the proposition that the interference need induce either a third party or plaintiff to breach their contract, we do not read *Stevens* that broadly. In fact, the alleged interference in that case was directed at a third party, the school board, which, although it could not legally breach the contract by directing a transfer to a different school, obviously was the party which took action to modify the plaintiff's employment as a result of the defendants' conduct, and the court so noted: "[Plaintiff] must establish a number of elements, including that the defendants' wrongful conduct caused the Board to breach its contract with the plaintiff." (*Stevens*, 661 F. Supp. at 712.) As this element of the counts sounding in interference with the contractual relationship and business expectancy in the instant case was neither alleged nor supported by any testimony that defendants' conduct induced a third party to breach the relationship or expectancy, summary judgment was additionally proper as to those counts. Moreover, as a conspiracy to commit an act is not actionable at law unless the underlying act itself constitutes wrongful or tortious conduct (*Galinski v. Kessler* (1985), 134 Ill. App. 3d 602, 606, 480 N.E.2d 1176, 1179), the conspiracy count must similarly fail.

▉▉ Finally, we decide whether the trial court erred in granting summary judgment in favor of the defendants, other than Nelson, Graham, and Stockman, who did not move for summary judgment. We find that the court below, having concluded that plaintiffs had no contractual or business rights or expectancies entitled to protection after July 8, 1982, because plaintiffs were collaterally estopped by the Federal judgment from maintaining that the agreement was induced by duress, could reasonably and without error have concluded that plaintiffs would also be collaterally estopped from maintaining its action against the remaining defendants. For purposes of judicial

economy, it would have made no sense for the court to have required a separate written motion for summary judgment for these defendants, which its conclusion in the summary judgment order for Nelson, Graham, and Stockman would necessarily have controlled. Moreover, these defendants noted at the hearing on their motion to dismiss that if the court granted Nelson, Graham, and Stockman's motion for summary judgment, then their motion to dismiss would be moot. Where, as here, whatever error the court made, in granting summary judgment for the defendants who had no written motion on file requesting same, could be cured by having these same defendants amend the pleadings to file this motion, we also believe it would be a waste of judicial time to reverse and remand the case based on summary judgment for those defendants. For the foregoing reasons, the order of the circuit court of Effingham County, Illinois, is affirmed.

Affirmed.

HOWERTON and GOLDENHERSH, JJ., concur.